OPINION OF THE COURT
Edwin Kassoff, J.
This is a proceeding pursuant to article 81 of the Mental Hygiene Law, seeking an appointment of a guardian for the property management of the alleged incapacitated person, Daniel King Le, also known as Daniel King Whildon. The petitioners are the adoptive sister and the attorney of the alleged incapacitated person.
Daniel King Le was born May 2, 1985 in New York. On August 14, 1985, Daniel and his one-year-old sister were removed from their parents’ home and placed in foster care with the Brooklyn Home for Children. Subsequently, in May 1987, Daniel and his sister were placed with their grandparents, Vincent Le and Sang Tran Le, by the New York City Department of Social Services, in their apartment in Astoria, Queens. The Les adopted the two children on October 31, 1989. They currently reside in San Jose, California.
On November 22, 1987, Daniel suffered severe injuries after falling four stories from a window in his Queens apartment. As a result of his injuries, Daniel underwent brain surgery on April 20, 1989 and an operation to repair a perforated ear drum on July 2, 1991. Despite the seriousness of Daniel’s injuries, he made a remarkable recovery and is no longer under *386 the regular care of any doctors. Daniel is a fun-loving active youngster who participates in all types of activities. However, Daniel has some difficulty with his schoolwork and is functioning at least one grade below his normal grade level. It is unclear at this time how far he will advance at school.
Daniel’s adoptive father, Vincent Le, subsequently commenced an action in Supreme Court, Queens County, against Michael Pistilli and Pistilli Realty Company, the owners and landlords of the apartment building where Daniel lived at the time of the accident. Prior to trial, a structured settlement was agreed to by all parties, which will pay a total guaranteed sum of $5,326,347 over Daniel’s lifetime. Justice Price, the Justice presiding over Daniel’s personal injury action, directed that appropriate guardianship proceedings be commenced to ratify the proposed settlement agreement. Thereafter, Daniel’s adoptive sister Nhan Thi Thanh (Kate) Le and his attorney, Stanley Young, commenced this proceeding to be appointed as Daniel’s property management coguardians. Pursuant to article 81 of the Mental Hygiene Law, a hearing was held before Justice Kassoff to determine whether petitioners should be appointed as Daniel’s property management coguardians.
Article 81 of the Mental Hygiene Law allows a guardian to be appointed for one’s personal needs, property management or both (Mental Hygiene Law § 81.02 [a]). The statute attempts to create a guardianship system that is tailored to meet the specific needs of the individual by taking into account the personal wishes, preferences, and desires of the alleged incapacitated person (Mental Hygiene Law § 81.01). Article 81 is thus based on the concept that the "needs of persons with incapacities are as diverse and complex as they are unique to the individual” (Mental Hygiene Law § 81.01). As a result, the guardian is given only those powers which he needs and no more. In this way, article 81 seeks to foster the least restrictive form of intervention consistent with an individual’s self-determination (Mental Hygiene Law § 81.02 [a] [2]).
Article 81 provides a two-prong test for determining whether a guardian should be appointed for an individual. Under section 81.02 (a) of the Mental Hygiene Law, the court can appoint a guardian for a person if it first determines that the appointment is necessary to provide for the personal needs or property management of the person. In reaching its determination for this first prong, the court considers all the evidence including, but not limited to, the report of the court evaluator and "the sufficiency and reliability of all available resources” *387 (Mental Hygiene Law § 81.02 [a] [2]). To satisfy the second prong, the individual must agree to the appointment or must be incapacitated (Mental Hygiene Law § 81.02 [a] [2]). Under Mental Hygiene Law § 81.02 (b), a determination of incapacity must be based on clear and convincing evidence that the person is likely to suffer harm because he is unable to provide for his personal needs and/or property management, and he cannot adequately understand and appreciate the nature and consequences of his inability. Article 81 further requires the court to give "primary consideration” to one’s functional level and functional limitations in making a determination of incapacity (Mental Hygiene Law § 81.02 [c]). This functional evaluation considers how an individual manages his activities of daily living, such as eating, shopping, dressing, housekeeping, and money management (Mental Hygiene Law § 81.03 [h]).
The court first finds that it has jurisdiction over the proceedings in the instant case. Mental Hygiene Law § 81.04 (a) (2) provides that the Supreme Court and the County Courts outside of New York City have the power to appoint a guardian "for a nonresident present in the state”. The statute does not define the term "present” and as article 81 only became effective April 1, 1993, there are no cases interpreting this section. The only helpful comments come from the Law Revision Commission, which indicate that the court can appoint a guardian for one physically present in the State, even though that person may not reside or be domiciled in the State. (Law Rev Commn Comments to section 81.04, reprinted in McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.04, 1995 Pocket Part, at 305.) Thus, it is necessary to see how courts have interpreted presence in other contexts.
The concept of physical presence as a basis for jurisdiction is firmly entrenched in American jurisprudence. Presence, or transient jurisdiction, can be traced back to the seminal case of Pennoyer v Neff (95 US 714). In Pennoyer, the Supreme Court recognized that jurisdiction could be acquired over a nonresident defendant who is served with process while present in the forum State (Pennoyer v Neff, supra, 95 US, at 735). Pennoyer came to be seen as establishing the "power” theory of jurisdiction. Under this theory, States are sovereign and can exercise complete power over persons and property in their territorial boundaries (Note, Transient Jurisdiction is Here to Stay: Burn-ham v Superior Court of California, 23 Conn L Rev 1125, 1132 [1991]).
The Supreme Court reaffirmed the notion that the mere presence of a defendant in the forum State is a sufficient basis for *388 jurisdiction in the landmark case of International Shoe Co. v Washington (326 US 310). The Court in International Shoe declared that a nonresident defendant who is not present in the forum State must have certain minimum contacts with the forum before jurisdiction can be acquired over him (International Shoe Co. v Washington, supra, 326 US, at 316). International Shoe was never intended to limit the jurisdiction of State courts over persons found within the borders of the forum State. Rather, the minimum contacts analysis evolved to extend the personal jurisdiction over nonresident defendants (Cariaga v Eighth Judicial Dist. Ct., 104 Nev 544, 546, 762 P2d 886, 887; Oxmans’ Erwin Meat Co. v Blacketer, 86 Wis 2d 683, 687, 273 NW2d 285, 287). In 1990, the Supreme Court again upheld the principle of transient jurisdiction in Burnham v Superior Ct. of Cal., Marin County (495 US 604). In Burnham, the defendant was a nonresident of California who was personally served with process while temporarily in the State in a suit unrelated to his activities in the State. The Supreme Court held that defendant’s brief presence in California was sufficient for the State to exercise jurisdiction over him. The Court noted the long history of jurisdiction based on physical presence, regardless of how brief defendant’s visit to the forum State was (Burnham v Superior Ct. of Cal., Marin County, supra, 495 US, at 610-611).
New York has adhered to the concept of transient jurisdiction. In Rawstorne v Maguire (265 NY 204, 208), the Court of Appeals stated that "[w]here there is 'bodily presence’ within the boundaries of the State there is opportunity for the exercise of the State’s sovereignty, even though bodily presence is not accompanied by an intention to remain there permanently.” (Rawstorne v Maguire, supra, 265 NY, at 208; see also, Matter of Auto Mut. Indem. Co., 14 NYS2d 601, 610 ["It is well settled that to obtain a valid personal judgment against a non-resident there must be personal service within the jurisdiction”].) Moreover, the notion of transient jurisdiction has been codified in CPLR 301, which provides that "[a] court may exercise jurisdiction over persons, property, or status as might have been exercised heretofore.” (See, FCNB Spiegel v Dimmick, 163 Misc 2d 152, 155; 1 Weinstein-Korn-Miller, NY Civ Prac % 301.12.) In addition, many other State and Federal courts have adhered to the notion that a defendant’s mere presence in the State is a sufficient basis for the assertion of jurisdiction (see, e.g., Rittenhouse v Mabry, 832 F2d 1380,1389 [5th Cir]; Amusement Equip, v Mordelt, 779 F2d 264, 268 [5th Cir]; Leab v Streit, 584 F Supp *389 748, 756 [SD NY]; Aluminal Indus. v Newtown Commercial Assocs., 89 FED 326, 329 [SD NY]; Hutto v Plagens, 254 Ga 512, 513, 330 SE2d 341, 342; Lockert v Breedlove, 321 NC 66, 68, 361 SE2d 581, 583; Oxmans’ Erwin Meat Co. v Blacketer, supra, 86 Wis 2d, at 689, 273 NW2d, at 287). Moreover, other States have extended the concept of physical presence to guardianship proceedings (see, e.g., Matter of Roberts v Powers, 311 Ark 101, 102, 841 SW2d 626, 627 [noting that mere physical presence of incapacitated person is proper basis for jurisdiction]). Applying these principles to the case at bar the court finds that since Daniel was physically present in the State at the time the guardianship proceeding was commenced, this court has jurisdiction to appoint a guardian for him. Moreover, the court finds that venue is proper in the instant case. Mental Hygiene Law § 81.05 provides, in pertinent part, that "[a] proceeding * * * shall be brought in the supreme court within the judicial district * * * in which the person alleged to be incapacitated resides, or is physically present”. Since Daniel is present in the county, venue is proper in Supreme Court, Queens County.
The court held an in camera (so that Daniel would feel free to make statements without possible pressure by anyone in the court) on the record interview with Daniel to determine whether he understood why he was in New York and whether he came to New York of his own volition. The court finds that Daniel is a capable, mentally alert individual and notwithstanding his tender years, he understood why he was in court and that he came to New York by his own free will. It was then put on the record in open court.
The court finds that there is clear and convincing evidence that Daniel is likely to suffer harm because he is unable to provide for his property management and cannot adequately understand and appreciate the nature and consequences of this inability. Daniel is a 10-year-old child and notwithstanding that he is a mentally alert individual, is incapable of managing his assets or agreeing to the terms of the structured settlement. Under a supplemental proposal that petitioners agreed to, Daniel would receive an initial payment of $450,000. Under this proposal, Daniel would receive $2,412 per month for life compounded at 3% per year, giving a total guaranteed yield of $1,376,806 and a lifetime yield of $4,110,159. In addition, Daniel would receive lump-sum payments beginning at age 30 and payable every five years until age 50, totalling $420,000. Under this proposal, Daniel and his estate, as beneficiary, are guaranteed $2,246,806 and a total lifetime yield of *390 $4,980,159. Given his tender years, Daniel is unable to properly manage assets to this extent and will likely suffer harm if a guardian to manage this property is not appointed. Daniel’s adoptive parents were born and raised in Vietnam and came to the United States in 1978. They have no experience dealing with legal matters or managing large sums of money and would not feel comfortable serving as Daniel’s property management coguardians.
The court also finds that a guardian is necessary to care for Daniel’s personal needs. As a result of Daniel’s youth and inexperience, he is unable to prepare his own meals, attend to his own purchases, provide for his education, and use public transportation by himself. The court directs that an application to remove the personal needs guardian shall be made when Daniel reaches the age when a guardian to care for his personal needs is no longer necessary.
In view of the foregoing, the court will appoint Nhan Thi Thanh Le and Charles Mirotznik as special coguardians for the personal needs and property management of Daniel King Le. The court will waive the filing of the bond by the special co-guardians. The court grants the special coguardians the power to settle and compromise Daniel’s claim against Michael Pistilli and Pistilli Realty Company and to pay any fees, legal and otherwise, associated with the personal injury action and the settlement. The special coguardians shall also have the power to handle all banking transactions on behalf of Daniel King Le, but no withdrawals are to be made except by further order of this court. The court further directs that the special co-guardians commence appropriate proceedings in the State of California for the appointment of a guardian or person with analogous authority for Daniel King Le. The court further empowers the special coguardians to authorize the access or release of confidential records. The court further directs that as soon as it is determined that Daniel King Le no longer needs a guardian to provide for his personal needs, an application will be made to remove such guardian. The aforementioned powers given to the special coguardians constitute the least restrictive form of intervention, as required in Mental Hygiene Law § 81.02 (a) (2).